# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

KENNETH STITES,

       Plaintiff,                               CASE NO. 07-CV-15405

-vs-                                              PAUL D. BORMAN
                                                      UNITED STATES DISTRICT JUDGE

FORD MOTOR COMPANY,
FIDELITY INVESTMENTS, and
DONNA STITES,

       Defendants.
_____/

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT
## TO DEFENDANTS FORD MOTOR COMPANY AND FIDELITY INVESTMENTS

Before the Court is a May 30, 2008 Motion for Summary Judgment filed by Defendants Ford Motor Company and Fidelity Investments (collectively "Defendants").[1] (Doc. No. 6). Plaintiff Kenneth Stites ("Plaintiff") filed a Response on July 7, 2008. The Court held a motion hearing on August 7, 2008. Having considered the entire record, and for the reasons that follow, the Court GRANTS Defendants' motion.

**I.     BACKGROUND**

This case arises from Plaintiff's allegations that Defendants improperly transferred 100% of his Tax Efficient Savings Plan for Hourly Employees ("TESPHE"), approximately $53,032.17, to his ex-wife, Donna Stites, in purported compliance with a state court qualified domestic relations order ("QDRO").

---

[1]     No counsel has appeared for Defendant Donna Stites, and she has failed to answer Plaintiff's Complaint.

Plaintiff resides in the City of Luther, in Lake County, Michigan. (Compl. ¶ 1). Donna Stites resides in the City of Fountain, in Mason County, Michigan. (*Id*. at ¶ 4). Plaintiff alleges that both Defendants are Michigan corporations, and Defendants have not contested this claim. (*Id*. at ¶¶ 2-3).

For almost thirty years, Plaintiff worked as an hourly employee at Ford. (*Id*. at ¶ 7). In February 1975, Plaintiff married Donna Stites. At some point during his employment at Ford, Plaintiff began participating in TESPHE, an employee pension plan managed by Ford Motor Company and administered by Fidelity Institutional Retirement Services Company. (Rec. 0182). Ford's employee handbook states the following concerning an hourly employee's TESPHE account:

> The TESPHE was established pursuant to the Collective Bargaining Agreement dated October 4, 1984, between the Company and [the unions], and was approved by the Board of Directors of the Company on November 8, 1984. The TESPHE was amended and continued pursuant to the Collective Bargaining Agreement dates October 25, 1999, between the Company and the Union. Contributions to the TESPHE commenced in March 1985.
>
> TESPHE is subject to certain provisions of [ERISA], including generally, the reporting and disclosure, participation and vesting, fiduciary responsibility, and administration and enforcement provisions in Title I of ERISA. TESPHE is also qualified under Sections 401(a) and 401(k) of the Internal Revenue Code of 1986, as amended.
>
> The TESPHE is intended to constitute a plan described in section 404(c) of ERISA. The fiduciaries of the TESPHE are relieved of liability for any losses which are the direct and necessary result of investment instructions given by members of the TESPHE.

(Rec. 0142).[2] The manual further discussed appeal procedures and steps to take if an employee's claim for benefits is denied:

---

[2] Ford claims that the TESPHE is an employee pension plan qualified under 29 U.S.C. § 1104(c).

> If you think there is an error in your TESPHE account or the amount of your TESPHE deduction from your Profit Share or eligible pay, you can submit an appeal to the TESPHE Committee. First call the Fidelity Service Center. They will try to resolve your concern or will assist you with the appeal process.
>
> If you feel the Company has made an error in administering your account, or if a claim is denied, you're entitled to a review. For information on the process followed in reviewing denied claims, see the "Administrative, ERISA, and [FMLA] Information" section of your Employee Benefits Handbook.

(*Id.*).

In or around late December 1997, Plaintiff divorced his wife Donna. On June 1, 1998, a Lenawee County Circuit Court entered a QDRO in which Donna was awarded 50% of Plaintiff's life income, temporary, and supplemental pension benefits computed as of December 31, 1997. (Rec. 0005). During mid-June 1998, Ford's QDRO administrator notified Plaintiff of the former's reception of the QDRO, and that the 50% monthly payments to Donna would begin when Plaintiff commenced receiving his retirement benefits. (Rec. 0008-09, 0029-30).

On October 1, 1998, Plaintiff retired from Ford. (Rec. 0017). At some point shortly thereafter, Plaintiff and Donna began receiving the pension payments in accordance with the QDRO.

As part of a second QDRO, entered on July 24, 2001, a Lenawee County Circuit Court ordered that Plaintiff pay Donna 50% of the funds in his TESPHE account, computed as of December 31, 1997. The QDRO stated, in relevant part:

> WHEREAS, the parties to this action and the Court intend this Order to be a Qualified Domestic Relations Order as that term is defined in Section 414(p) of the Internal Revenue Code of 1986, as amended, and Section 206(d)(3)(B) of [ERISA].
>
> WHEREAS, the parties have stipulated that the Court shall enter this Order as part of the Judgment of Divorce entered in this action, and as such, it is incorporated by reference therein.

NOW THEREFORE IT IS HEREBY ORDERED that assets held for the benefit of the participant named below under the Ford Motor Company's [TESPHE], a defined contribution plan, shall be divided and distributed in accordance with the following:

1. The Plan shall separate the assets in the account of the participant under the Plan as of December 31, 1997 so that 50% of all assets in the participant's account shall be set aside into a separate account for the benefit of the alternative payee named below. Such separate account shall be held and distributed as follows:

    (a) The separate account for the payee shall have the same rights with respect to this new subaccount including vesting, withdrawal and investment elections, and other matters provided in the Plan for the Participant in the plan, in accordance with the provisions of the plan

    (b) Assets in the separate account for the alternate payee shall be invested in accordance with the provisions of the Plan and elections by the alternate payee.

    (c) In the event of death of the alternative payee, the assets in such alternate payee's account shall be distributed to the beneficiary named by the alternative payee in accordance with the provisions of the Plan: or in the absence of such designation to the alternative payee's estate.

(Rec. 0049).

Ford's employee benefits manual explained the effect of a QDRO to a TESPHE account:

In general, the rules summarized above that apply to payment to employees also apply to payments to surviving spouses of employees and to spouses or former spouses who are "alternative payees." You are an alternate payee if your interest in the TESPHE account results from a "qualified domestic relations order," which is an order issued by a court, usually in connection with a divorce or legal separation.

(Rec. 0136).

The QDRO was forwarded onto Ford. On September 14, 2001, an individual from Ford's QDRO unit sent a letter to Fidelity informing the latter to place a stop on Plaintiff's TESPHE account to bar all withdrawals or loans. (Rec. 0051).

4

On September 21, 2001, Ford sent a letter to Plaintiff informing him that it had received the July 24, 2001 QDRO. (Rec. 0031-32). The letter stated in relevant part:

> It is our understanding that the order specifies the amount to be held for the benefit of the alternate payee is as follows:
>
> 1. The amount to be held for the benefit of the alternate payee shall be 50% of the participant's TESPHE account as of December 31, 1997. The alternate payee will receive subsequent earnings (i.e. dividends, interest, gains and/or losses) or her portion from that date to the date of distribution.
>
> 2. The alternate payee will have the same rights with respect to this new account including vesting, withdrawal and investment plans as though the alternate payee was the participant. The alternate payee will be entitled to in-service withdrawals pursuant to the Plan's provisions in effect at the time of distribution, and a total withdrawal from the Plan once the alternate payee reaches age 59 ½ or participant terminates his employment which ever occurs first.

(Rec. 0032). From the record, Plaintiff did not make any objections in the state court to this arrangement.

According to financial statements issued by Ford, by December 31, 1997, the value of Plaintiff's TESPHE account was $86,937.08. (Rec. 0064-65). However, by September 27, 2001, due to withdrawals and market devaluation, the value of Plaintiff's account was $53,070.65. (Rec. 0067-68). Fidelity calculated that Donna's 50% share of the $86,937.08, taking into account dividends, interest, and gains/losses, exceeded the balance left in Plaintiff's account as of September 27, 2001. By September 28, 2001, Fidelity transferred $53,070.65 into a new account created for Donna. (*Id.*). By the end of 2001, Plaintiff had only $30.60 in his TESPHE account. (Rec. 0082-83).

Although Fidelity consummated the transaction at the end of September 2001, Plaintiff insists that he attempted to contact Defendants about the status of his TESPHE account during

September 2005, attaching a hand-written note purportedly written by Plaintiff. (Pl. Br. Ex. 10, 9/20/05 Note).

Defendants insist that they did not receive any correspondence from Plaintiff until March and August of 2006. On August 9, 2006, Plaintiff's counsel wrote a letter to Fidelity requesting into the status of Plaintiff's TESPHE account. (Rec. 0199).

On March 19, 2007, Plaintiff filed a show cause order in Lenawee County Circuit for why Fidelity should not be held in contempt for violating the terms of the QDRO. (Pl. Br. Ex. 2, 3/19/07 Motion to Show Cause). On March 30, 2007, Fidelity responded to Plaintiff directly by letter and provided the documents and records requested by Plaintiff. (Pl. Br. Ex. 3, 3/30/07 Letter).

On May 16, 2007, Fidelity sent Plaintiff a letter explaining, in relevant part, the distribution of his TESPHE account:

> I have since confirmed that the Plan sponsor, Ford Motor Company, qualified [Plaintiff's] July 2001 Domestic Relations Order. After qualification, the Plan sponsor provided direction to Fidelity describing how to segregate [Plaintiff's] Plan account to the alternative payee, Donna Stites. At the direction of Ford, Fidelity completed this segregation on September 28, 2001.
>
> The unrealized gain/loss of $53,032.17 represents the total gain or loss that [Plaintiff] experienced in his Plan account during the statement period, January 1, 2001 – December 31, 2001. This includes the amount segregated to [Plaintiff's] account. As you know, [Plaintiff's] account balance totaled $53,070.56 on September 28, 2001.

(Pl. Br. Ex. 9, 5/16/07 Letter).

On or about November 13, 2007, Plaintiff filed a suit against Defendants and Donna Stites in Washtenaw County Circuit Court, alleging state law counts of negligence and unjust enrichment. On December 19, 2007, Defendants removed the case to this Court on the basis that

ERISA completely preempted Plaintiff's state law claims. Plaintiff did not contest the December 2007 removal at that time.

On April 30, 2008, Defendants filed with this Court an "Administrative Record." On May 30, 2008, Defendants filed the instant motion for summary judgment, on the following grounds: (1) Plaintiff failed to exhaust his administrative remedies; (2) ERISA preempts Plaintiff's state law claims; (3) Plaintiff failed to file the instant suit within ERISA's statute of limitations; and (4) The distribution of the TESPHE funds was not arbitrary or capricious.

Plaintiff responds that: (1) ERISA explicitly does not preempt state law claims arising from QDROs, consequently the Court lacks subject matter jurisdiction and must remand; (2) Fidelity erroneously transferred 100% of Plaintiff's TESPHE account, rather than the 50% as stated in the relevant QDRO order; and (3) Fidelity should be equitably estopped from making a statute of limitations argument when it was the only entity in possession of the relevant information.

## II. ANALYSIS

### A. Standard for Summary Judgment

The United States Court of Appeals for the Sixth Circuit has summarized the standard for summary judgment:

> Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. "The judge is not to weigh the evidence and determine the truth of the matter, but rather determine whether there is a genuine issue for trial."

*Totes Isotoner Corp. v. Int'l Chemical Workers Union Council/UFCW Local 664C*, 532 F.3d 405, 410-11 (6th Cir. 2008) (internal citations omitted).

## B. ERISA Preemption of State Law Claims

Defendants contend that ERISA completely preempts Plaintiff's state law claims of negligence and unjust enrichment. Plaintiff responds that: (1) his instant claims fall under an ERISA exception exempting QDROs; and (2) this Court remand Plaintiff's case back to Washtenaw County Circuit Court. Both parties cite inapposite cases in support.

Plaintiff's allegations against Defendants include the following:

12. Defendants owed Plaintiff the duty of due and reasonable care.

13. Defendant breached his duties and was negligent by:

    a. failing to maintain and protect Plaintiff's "TESP[H]E" account by transferring 100% of said account to Donna Stites.

    b. failing to warn, and/or advise Plaintiff that they transferred 100% percent of Plaintiff's "TESP[H]E" to Donna Stites.

14. One of more of Defendant's negligent acts or omissions was a legal and proximate cause of Plaintiff's lead poisoning.[3]

15. As a result of Defendants['] negligence, Plaintiff has and will in the future suffer from Defendants transferring 100% percent of the "TESP[H]E" account to Defendant, Donna Stites, as he has an investment loss and a balance of $34.08 in his "TESP[H]E."

. . . .

17. As a result of the conduct above, Plaintiff will be unjustly enriched at the expense of Defendant, Donna Stites and the other Defendants.

Section 1144(a) of Title 29 United States Code states:

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

---

[3] This is a puzzling allegation; likely a glitch in Plaintiff's attorney's computer.

However, ERISA contains an express exception to § 1144(a) pertaining to QDROS. The pertinent section states that "[s]ubsection (a) of this section shall not apply to qualified domestic relations orders (within the meaning of section 1056(d)(3)(B)(I) of this title)[.]" 29 U.S.C. § 1144(b)(7). Section 1056(d)(3) provides in relevant part:

> (B) For purposes of this paragraph--
>
>   (I) the term "qualified domestic relations order" means a domestic relations order--
>
>     (I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and
>
>     (II) with respect to which the requirements of subparagraphs (C) and (D) are met, and
>
>   (ii) the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which--
>
>     (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
>
>     (II) is made pursuant to a State domestic relations law (including a community property law).
>
> (C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies--
>
>   (I) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
>
>   (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

9

  (iii)  the number of payments or period to which such order applies, and

  (iv)  each plan to which such order applies.

(D) A domestic relations order meets the requirements of this subparagraph only if such order--

  (I)  does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

  (ii)  does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

  (iii)  does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

In *Boggs v. Boggs*, 520 U.S. 833 (1997), the United States Supreme Court discussed the nature of a QDRO as discussed in §§ 1144(b)(7) and 1056(d):

> Section 1056's QDRO provisions likewise recognize certain pension plan community property interests of nonparticipant spouses and dependents. A QDRO is a type of domestic relations order that creates or recognizes an alternate payee's right to, or assigns to an alternate payee the right to, a portion of the benefits payable with respect to a participant under a plan. A domestic relations order, in turn, is any judgment, decree, or order that concerns "the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant" and is "made pursuant to a State domestic relations law (including a community property law)." A domestic relations order must meet certain requirements to qualify as a QDRO. QDRO's, unlike domestic relations orders in general, are exempt from both the pension plan anti-alienation provision, § 1056(d)(3)(A), and ERISA's general pre-emption clause, § 1144(b)(7). In creating the QDRO mechanism Congress was careful to provide that the alternate payee, the "spouse, former spouse, child, or other dependent of a participant," is to be considered a plan beneficiary. These provisions are essential to one of REA's central purposes, which is to give enhanced protection to the spouse and dependent children in the event of divorce or separation, and in the event of death the surviving spouse.

*Id*. at 846-47 (internal citations omitted).

  The Sixth Circuit has had several occasions to address the scope of § 1144(b)(7). In

*Metropolitan Life Insurance Company v. Marsh*, 119 F.3d 415 (6th Cir. 1997), an interpleader action, a deceased widow claimed that she was the designated beneficiary of her late husband's insurance policy, while the husband's children from his first marriage asserted that under a preexisting divorce decree they were entitled to two-thirds of the life insurance proceeds. *Id*. at 416. The Sixth Circuit held that: (1) ERISA's QDRO exception applies to both pension and welfare plans; and (2) the district court erred by concluding that the state court QDRO did not meet the statutory requirements for preemption under § 1056(d). *Id*. at 421-22.

In *Seaman v. Johnson*, 91 F. App'x 465 (6th Cir. Mar. 4, 2004) (unpublished), another interpleader action, the decedent's ex-wife argued that her status as the designated beneficiary on her deceased ex-husband's life insurance policy trumped a 1976 divorce decree substituted two minor children of a women that the decedent eventually married. *Id*. at 466-67. The Sixth Circuit observed:

> [T]he general rule of ERISA preemption contains an exception for qualified domestic relations orders. Where, as here, the proper distribution of assets contained in an employee benefit plan is at issue, ERISA controls and presumptively preempts state law. Moreover, where the proper distribution of assets is arguably controlled by a state-court domestic relations order, the threshold question is whether that order represents a QDRO as defined by 29 U.S.C. § 1056 of ERISA. That initial question is one for the federal courts.
> . . . .
> [Section] 1056(d)(3)(J) provides that "[a] person who is an alternate payee under a qualified domestic relations order shall be considered for purposes of any provision of this chapter a beneficiary under the plan." If Congress intended to terminate federal jurisdiction at the time that a domestic relations order was deemed a QDRO, it would presumably not have included a provision directing the plan administrator to make payments to a beneficiary who holds (or was divested of) such status based solely upon a QDRO. In short, we read § 1056(d)(3)(J) as essentially incorporating the QDRO into the ERISA plan for the purpose of determining the appropriate beneficiary. This conclusion is further supported by other provisions, such as §§ 1056(d)(3)(F) and (G), that direct a plan administrator to take note of a QDRO in determining benefits due under the plan. Finally, we are unable to locate a single case that stands for the proposition that federal subject matter jurisdiction terminates

upon a determination that the existence of a QDRO controls the beneficiary of an ERISA plan. Accordingly, we conclude that the district court properly exercised its jurisdiction throughout these proceedings.

*Id*. at 469-70 (internal citations omitted).

Defendants do not dispute in their briefing that the QDRO in question in the instant case satisfies the requirements of § 1056(d). Furthermore, the July 24, 2001 state court order itself stated that the parties considered it to be a QDRO. Finally, Defendants themselves considered the state court order a QDRO in effecting the distribution. (Rec. 0031-0032). The Ninth Circuit has summarized the § 1056(d)(3) qualifications for a QDRO:

> A domestic relations order qualifies as a QDRO only if it meets the "specificity" requirements set forth in § 1056(d)(3)(C): (1) the order must specify the name and mailing address of the alternate payee and the affected plan participant, (2) the amount or percentage of the participant's benefits to be paid or the means by which that amount will be determined, (3) the number of payments or time period to which the order applies, and (4) each plan to which the order applies. In addition, under § 1056(d)(3)(D), a QDRO must *not* (1) require the plan to provide any type of benefit not otherwise provided, (2) require the plan to provide increased benefits, or (3) require benefits to be paid to an alternate payee which must be paid to another alternate payee under another QDRO.

*Hamilton v. Washington State Plumbing & Pipefitting Industry Pension Plan*, 433 F.3d 1091, 1097 (9th Cir. 2006) (emphasis in original) (footnotes omitted); *see Mattingly v. Hope*, 260 F. App'x 776, 779 (6th Cir. Jan. 8, 2008) (unpublished). The Sixth Circuit has further recognized that a QDRO can "substantially comply" with the statute's requirements. *Marsh*, 119 F.3d at 422.

The instant QDRO substantially complies with § 1056(d)(3). The order: (1) specifies the name and mailing address the alternative payee, Donna Stites; (2) the percentage of the participant's benefits to be paid – 50%; and (3) the specification of the TESPHE plan. Furthermore, the QDRO does not specify any of the prohibitions in § 1506(d)(3)(D).

12

The Court find that ERISA completely preempts Plaintiff's instant state law claims. The crux of Plaintiff's claims is that Defendants breached their duty to him by wrongfully transferring funds from his TESPHE account. The Sixth Circuit has repeatedly recognized that "[i]t is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit." *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 702 (6th Cir. 2005) (quoting *Cromwell v. Equicor-Equitable HCA Corp.,* 944 F.2d 1272, 1276 (6th Cir.1991)). Regardless of the labels placed on Plaintiff's claim, he is seeking recovery of employee benefits purportedly due to him. *See Seaman*, 91 F. App'x at 469-70 (holding that federal question jurisdiction is not terminated merely because it is determined that a QDRO controls the plan's beneficiaries).

    **C.**    **Exhaustion of Administrative Remedies**

Defendants contend that Plaintiff's ERISA claims should be dismissed for failure to exhaust his administrative remedies under the terms of his plan – which required that he first call the Fidelity Service Center, then submit an appeal to the TESPHE committee.

The Sixth Circuit has explained the nature of ERISA's administrative exhaustion requirement:

> While "application of the administrative exhaustion requirement in an ERISA case is committed to the sound discretion of the district court," that discretion must be exercised "to excuse nonexhaustion where resorting to the plan's administrative procedure would simply be futile[.]" Generally speaking, we have applied the administrative-futility doctrine in two scenarios: (1) when the "Plaintiffs' suit [is] directed to the legality of [the plan], not to a mere interpretation of it," and (2) when the defendant "lacks the authority to institute the [decision] sought by Plaintiffs[.]" To meet the "quite restricted" standard for establishing administrative futility, we have required a litigant to "make a clear and positive indication" that further administrative review would have come to naught.

13

*Dozier v. Sun Life Assurance Co. of Canada*, 466 F.3d 532, 534-35 (6th Cir. 2006) (internal citations omitted).

From the record, Plaintiff states that he attempted to contact Fidelity in 2005 and received no response. In response to Plaintiff's counsel's March 19, 2007 show cause order in state court, Fidelity sent a letter explaining its compliance with the QDRO. The Sixth Circuit has recognized on at least one occasion that a plan administrator's letter to a party's counsel explaining the initial denial of benefits is generally not sufficient to demonstrate administrative exhaustion. *See Smith v. Local 25 Iron Workers' Pension Plan*, 99 F. App'x 695, 698-99 (6th Cir. May 26, 2004) (unpublished). Likewise, this letter does not indicate that upon the further administrative review, for which Plaintiff's plan provided, would have reached the same result. *Id*. Moreover, Plaintiff waited at least four years to attempt to notify Fidelity of the alleged improper distribution.

As a result, since Plaintiff has not shown that administrative exhaustion would be futile, the Court finds that dismissal of the instant case is appropriate.

### D.  Statute of Limitations

As an alternative ground for dismissal, Defendants contend the Plaintiff's case is barred by ERISA's three-year statute of limitations, since Plaintiff had "actual knowledge" of his claim as of October 9, 2001. *See* 29 U.S.C. § 1113(2). Even if the six-year limitations governed, Defendants submit that Plaintiff's filing suit on November 13, 2007, violated that provision as well.

14

ERISA's statute of limitations clock begins to run "when a fiduciary gives a claimant clear and unequivocal repudiation of benefits that alone is adequate to commence accrual, regardless of whether the repudiation is formal or not." *Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 302 (6th Cir. 2006). The Sixth Circuit has provided the relevant analysis for evaluating whether a plaintiff had "actual knowledge" for the purposes of the three-year limitations period:

> [R]elevant knowledge required to trigger the statute of limitations under 29 U.S.C. § 1113(2) is knowledge of the facts or transaction that constituted the alleged violation; it is not necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger the running of the statute.
> . . . .
> Neither *Fink* nor any of its progeny suggest that [a p]laintiff[ is] entitled to sit on such knowledge
> . . . .
> [W]e hold that to trigger the running of the statute of limitations under Section 413(2) of ERISA, 29 U.S.C. § 1113(2), it is only the plaintiff's actual knowledge of the underlying conduct giving rise to the alleged violation that is required, rather than the knowledge that the underlying conduct violates ERISA. We reject [the] argument that the three-year limitation period is tolled until the plaintiff consults with an attorney and learns from the attorney that he has a claim for breach of ERISA fiduciary duties. In fact, even the Third Circuit has made clear that the running of the three-year statute of limitations is not tolled until an attorney tells the plaintiff that he has a claim.

*Wright v. Heyne*, 349 F.3d 321, 330-31 (6th Cir. 2003) (internal citations omitted).

In the instant case, Plaintiff received a Fidelity statement in October 2001 showing that his relevant assets had been transferred pursuant to the QDRO. There is no allegation from Plaintiff that he never received the statement from Fidelity. By his own admission, Plaintiff did not attempt to inquire into this transaction until at least September 2005. In other words, Plaintiff "sat on" information in his possession for approximately four years. As explained in *Wright*, the clock starts ticking when a plaintiff had actual knowledge of the wrong, and not when an

attorney eventually informs the plaintiff that the defendant has possibly violated ERISA. Here, it is undisputed that Plaintiff knew as of October 2001 that Fidelity had transferred the entirety of the remaining balance of his TESPHE account. Therefore, the Court finds that § 1113(2) applies and bars Plaintiff's instant case.

Even if the six-year limitation period applied, Plaintiff's filing of suit in November 2007 exceeded that limit as well.

Thus, the Court finds that ERISA's statute of limitations provisions bar Plaintiff's case.

### E. Defendants Did Nothing Wrong

Even if the Court were to reach the merits of Plaintiff's claims, Defendants appear to have complied with the clear terms of the state court order. The QDRO required Defendants to pay out to Donna Stites 50% of the value of Plaintiff's TESPHE benefits as calculated on December 31, 1997. They did that exactly. Moreover, the parties stipulated to the QDRO in state court; and the record shows no indication that Plaintiff ever objected to the order.

## III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment.

**SO ORDERED.**

          s/Paul D. Borman
          PAUL D. BORMAN
          UNITED STATES DISTRICT JUDGE

Dated: August 18, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 18, 2008.

s/Denise Goodine  
Case Manager